**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ACTIVECARE, INC.,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 18-_____ (___)<br><br>(Joint Administration Pending) |

**DECLARATION OF MARK ROSENBLUM, CHAIRMAN AND CHIEF EXECUTIVE
OFFICER OF DEBTORS, IN SUPPORT OF CHAPTER
11 PETITIONS AND FIRST DAY PLEADINGS**

  Pursuant to 28 U.S.C. § 1764, Mark Rosenblum, declares as follows under the penalty of perjury:

  1.  I serve as the Chairman of the Board of Directors ("**Chairman**") and Chief Executive Officer ("**CEO**") of ActiveCare, Inc., a Delaware corporation, along with its wholly-owned subsidiary 4G Biometrics, LLC, a Texas limited liability company (collectively, the "**Debtors**" or the "**Company**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

  2.  I have served as Chairman and CEO of the Company since December 11, 2017.

  3.  I am knowledgeable and familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

---

[1] Pursuant to 11 U.S.C. § 342(c)(1), the Debtors in these cases, along with the last four digits of each Debtor's federal tax-identification number, are: ActiveCare, Inc. (8125); and 4G Biometrics, LLC (5678). The location of the Debtors' corporate headquarters and their address for notice purposes is 1365 West Business Park Drive, Suite 100, Orem, UT 84058.

4.      References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

5.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**"). The Debtors will continue to operate their business as debtors in possession.

6.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

7.      This First Day Declaration provides: (a) an overview of the Debtors' businesses, capital structure, and significant prepetition indebtedness; (b) a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings; and (c) the relevant facts in support of the First Day Pleadings.

---

[2]   Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

I.      **COMPANY AND BUSINESS OVERVIEW**

     A.      **Overview of Business Operations**

     7.      The Company is a real-time health analytics and monitoring company incorporated in the State of Delaware with its headquarters located in Orem, Utah. The Company's focus is on the monitoring of individuals with diabetes. The Company believes it offers a unique approach to caring for individuals with diabetes by adding a "human touch" and monitoring component to traditional disease management. The Company has created a "CareCenter" where its highly trained "CareSpecialists" reach out to engage members while monitoring their condition on a regular and real-time basis. The Company's personalized and active monitoring approach allows for issues to be addressed promptly, avoiding major and costly future health complications.

     8.      The Company operates a CareCenter that is centrally located at its headquarters in Orem, Utah and can monitor diabetics throughout the United States. The CareCenter is staffed with highly trained CareSpecialists that help the Company's members through the ups and downs of managing their glucose levels by providing real-time blood glucose test results and around the clock support. CareSpecialists receive extensive initial and on-going training comparable to the training received by 911 emergency dispatchers (National Academy of Emergency Dispatchers). Upon being hired, a CareSpecialist goes through a two week course, in which they have classroom training on what diabetes is and how to handle compliance calls and alert calls. The CareSpecialists offer various forms of assistance, including help in emergencies, health monitoring, and concierge services. The Company believes that each CareSpecialist can handle approximately 2,000 active diabetic members and make 300 outbound calls per week, as well as respond to emergency calls when readings are out of stated parameters. With real-time

data, the CareSpecialists provide proactive support and encouragement to members before they become high risk.

9.      The Company's revolutionary diabetes monitoring program provides diabetics, clinicians, and other designated caregivers real-time awareness into their glucose management. Members receive a state-of-the-art cellular glucometer and testing supplies, which allow for test results to be sent wirelessly to the Company immediately after every test. Members reach the CareCenter through the Personal Assistance Link, the Company's patented, one-button emergency cell phone. The Company provides additional strategies and programs designed to better change member behavior and improve their health.

### B.      Capital Structure

Equity Holders

10.     To date, the Company's operations have been funded primarily through the sale of its common stock, debt financing, and issuance of convertible preferred stock, notes payable, and warrants.

11.     Debtor's outstanding voting common shares are held as follows:

| Name | Ownership Percentage |
|---|---|
| Cede & Co | 20.04% |
| Tyumen Holdings LLC | 10.81% |
| James Dalton | 7.22% |
| Advance Technology Investors, LLC | 5.50% |
| Bluestone Advisors LLC | 5.27% |

Additionally, David Derrick indirectly holds 5.18% of the common shares, and Jeffrey Peterson indirectly holds 18.05% of the common shares. The Company also has non-voting preferred shares outstanding.

Secured Debt

*Loan and Security Agreement with Partners for Growth IV, L.P.*

12.     On February 19, 2016, the Company entered into a loan and security agreement (as amended or modified from time to time, the "**Loan and Security Agreement**") with Partners for Growth IV, L.P. (the "**Pre-Petition Lender**" or "**PFG**") and issued certain notes payable in connection therewith. Pursuant to the Loan and Security Agreement, the Pre-Petition Lender made available credit to the Company in the maximum aggregate principal amount of $4,500,000. These obligations are secured by a first priority security interest in all of the Debtors' assets.

13.     After defaulting under the Loan and Security Agreement, the Company entered into multiple forbearance agreements with the Pre-Petition Lender, pursuant to which the Pre-Petition Lender agreed to forbear from exercising remedies under the Loan and Security Agreement due to the Company's defaults until a date specified in the applicable forbearance agreement (collectively, the "**Forbearance Agreements**").

14.     On March 31, 2017, PFG and the Company entered into Modification No. 1 to the Loan Agreement and Security Agreement (the "**Modification 1**"), pursuant to which the Pre-Petition Lender agreed to lend the Company up to an additional $300,000 (the "**Additional Loan**"). On March 20, 2017, the Pre-Petition Lender loaned the Company $300,000, representing the maximum amount of the Additional Loan. The Additional Loan (i) bears interest at the rate of 12.25% per annum; (ii) became due May 31, 2017; (iii) required payment of a

5

$3,000 modification fee; and (iv) required payment of a monthly fee of up to $50,000 for each month the Additional Loan remains outstanding. The Additional Loan is secured by all of the Debtors' assets.

15.     Since April 2018, the Company and PFG have entered into additional modification agreements to the Loan and Security Agreement, whereby PFG agreed to provide an additional advance of loans to the Company. On April 11, 2018, PFG and the Company entered into that certain Modification No. 2 to Loan and Security Agreement ("**Modification 2**"). Subsequent to Modification No. 2, PFG made protective advances to the Company in the aggregate principal amount of $998,000 so that the Company could continue its operations. On June 6, 2018, PFG and the Company entered into that certain Modification No. 3 to Loan and Security Agreement ("**Modification 3**"). On June 19, 2018, PFG and the Company entered into that certain Modification No. 4 to Loan and Security Agreement ("**Modification 4**"), pursuant to which the Company requested that PFG make an additional advance of $375,000 to the Company. On June 20, 2018, PFG advanced the additional $375,000 to the Company. On July 2, 2018, PFG and the Company entered into that certain Modification No. 5 to Loan and Security Agreement ("**Modification 5**", together with Modification 1, Modification 2, Modification 3, and Modification 4, the "**Modification Agreements**"), pursuant to which the Company requested that PFG make an additional advance of $100,000. On July 2, 2018, PFG advanced the additional $100,000 to the Company. In accordance with the Modification Agreements and the Loan and Security Agreement, PFG has made protective advances to the Company in the aggregate principal amount of $1,473,000. The Loan and Security Agreement and Modification Agreements are hereinafter collectively referred to as the "**Pre-Petition Loan Agreement**").

16.     On July 2, 2018, 4G Biometrics, LLC ("**4G Biometrics**") executed a Joinder to Loan and Security Agreement, joining 4G Biometrics as a co-Borrower under the Pre-Petition Loan Agreement (the "**Joinder**").  The Pre-Petition Loan Agreement, and the other agreements, documents, instruments, and certificates executed by the Debtors or otherwise delivered in connection with the Pre-Petition Loan Agreement are hereinafter collectively referred to as the "**Pre-Petition Loan Documents**".

17.     Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Lender agreed to provide the Debtors with revolving loans and term loans in an aggregate principal amount of up to $4,500,000.  As of the Petition Date, the outstanding principal amount owed by the Debtors with respect to the revolving loans, term loans and other protective advances made under the Pre-Petition Loan Agreement was not less than $4,863,976.15 (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Pre-Petition Loan Documents, including, without limitation, accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of the Debtors' obligations pursuant to the Pre-Petition Loan Documents, the "**Pre-Petition Obligations**").

18.     To secure the Pre-Petition Obligations, the Debtors granted to the Pre-Petition Lender security interests in and liens on (collectively, the "**Pre-Petition Liens**"), substantially all assets and properties of the Debtors, as more specifically set forth in the Pre-Petition Loan Agreement, including, without limitation, all Accounts,[3] all Inventory, all Equipment, all

---

[3]  Capitalized terms not otherwise defined in this sub-paragraph shall the meanings ascribed to them in the Pre-Petition Loan Documents.

Collateral Accounts, including Deposit Accounts (including all of the Debtors' cash, the "**Cash Collateral**"), all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights, and interests in any of the above, and all guaranties and security for the any of the above, and all substitutions and replacements for, additions, accession, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of any of and all of the above; and all Debtors' books relating to any of the above (collectively, and as defined as "Collateral" in the Pre-Petition Loan Agreement, the "**Pre-Petition Collateral**").

19.     The Pre-Petition Lender filed: (a) UCC-1 Financing Statements regarding the Pre-Petition Collateral against the Debtors in the applicable state and/or county filing offices; and (b) notices of security interest regarding the Pre-Petition Collateral consisting of intellectual property in the applicable filing offices.

20.     The Debtors represent that all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original Pre-Petition Collateral or proceeds of other Pre-Petition Collateral, constitute the Pre-Petition Collateral of the Pre-Petition Lender.

21.     The Debtors are in default of their debts and obligations under the Pre-Petition Loan Documents.

*CBSG Factoring Agreement*

22.     On April 17, 2017, the Company entered into a Factoring Agreement (the "**Factoring Agreement**") with Complete Business Solutions Group ("**CBSG**"). The Company had previously entered into factoring arrangements with CBSG in the ordinary course of business and in amounts received that were less than $400,000. The Factoring Agreement

8

provided for an advance of $1,794,000 that comprised $1,000,000 in cash and the consolidation of $794,000 from four prior transactions into the amounts owed under the Factoring Agreement (collectively, the "**CBSG Funds**"). In consideration for the CBSG Funds, the Company sold to CBSG all future receipts until the total amount of $2,511,600.76 had been paid. The Factoring Agreement required payment of the minimum daily amount of $12,999.99 for 193 days. Repayment of the amounts owing under the Factoring Agreement is with recourse and secured by all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory of the Company. CBSG has subordinated its security interest to PFG. The amount owed to CBSG is guaranteed by Jeffrey Peterson, the Company's former CEO. As of the Petition Date, CBSG is owed the outstanding balance of principal and interest in the aggregate of $1,772,095.63.

Unsecured Debt and Trade Creditors

*BioTelemetry Note and Product Agreement*

23.    On March 21, 2016, the Company entered into a Product Agreement (the "**Product Agreement**") with Telcare Medical Supply, LLC and Telcare, Inc. (collectively, "**Telcare**"), each a wholly owned subsidiary of BioTelemetry, Inc. (together with Telcare, "**BioTelemetry**"), whereby Telcare agreed to, *inter alia*, supply the Company with glucometers and glucose testing strips. BioTelemetry is the Company's key supplier because the glucometers and glucose testing strips provide by BioTelemetry are essential to the Company's business operations.

24.    Also on March 21, 2016, the Company executed that certain Promissory Note in favor of Telcare in the principal amount of $2,523,937.48, with interest accruing at a rate of

0.65% per annum (the "**Telcare Note**"). The Telcare Note was to be repaid over twenty-two (22) installment payments, the last of which was scheduled for January 1, 2018.

25.     The Company failed to make necessary payments on the Telcare Note and under the Product Agreement, and Telcare and the Company renegotiated the terms of their agreements. On September 25, 2017, Telcare and the Company entered into the following agreements: (a) that certain Accord and Satisfaction Agreement; (b) that certain Diabetes Services Agreement; and (c) that certain Diabetes Patient Referral Agreement (collectively, the "**New Telcare Agreements**"). Pursuant to the New Telcare Agreements, the Company would continue to provide monitoring services to its members with respect to Telcare's products, and Telcare would issue payment to the Company in consideration for those services. Further, Telcare would provide billing, collections, and distribution services on behalf of the Company and collect, in addition to payment for its services and products, the outstanding amounts owed to Telcare. The Company also agreed to allow Telcare to manage the Company's financial accounts as the sole signatory on those accounts. Although Telcare had access to the Company's accounts, Telcare was unable to collect on many receivables due to issues invoicing customers.

26.     As of the Petition Date, the Company owes an aggregate of $4,082,734.20 to Telcare.

*Bridge Financing*

27.     Based on cash projections prepared in November 2017 and the potential of new business, several existing lenders collaborated in an attempt to raise capital under new leadership (the "**Bridge Financing**"). In connection with the closing of the Bridge Financing on the effective date of December 11, 2017, the Company entered into a Securities Purchase Agreement (the "**Purchase Agreement**") with four accredited investors, including myself as the Company's

new CEO (each an "**Investor**" and together, the "**Investors**"). The Investors raised a total of $600,000 in bridge loans (the "**Bridge Loans**").

28.    Pursuant to the Purchase Agreement, the Investors purchased from the Company (a) promissory notes in the aggregate principal amount of $631,578.06 (the "**Bridge Notes**") due and payable six months from the effective date and (b) common stock purchase warrants, exercisable for five years from the date of issuance to purchase up that certain amount of shares with an aggregate exercise amount equal to $600,000 at an exercise price per share equal to the lesser of (i) 80% of the per share price of common stock in the companies contemplated private placement of securities of up to $5,000,000, contemplated to take place within six months of the effective date (the "**Private Placement**"); (ii) $3.00 per share; (iii) 80% of the offering price in the Private Placement (if applicable); or (iv) 80% of the exercise price of any warrants issued in the Private Placement. The Bridge Notes were issued in favor of the Investors with an original issue discount equal to five percent (5%).

29.    Additionally, pursuant to the Purchase Agreement, the Company is required to issue the Investors common stock worth 30% of the purchase price paid by each Investor (the "**Origination Dollar Amount**") on the 5th trading day after the pricing of the Private Placement, but in no event later than six months from the Effective Date. The Origination Dollar Amount would be divided by the lowest of (a) $3.00 (subject to adjustment for stock splits); (b) 80% of the common stock offering price in the Private Placement; (c) 80% of the offering price of the Private Placement (if applicable); or (d) 80% of the exercise price of any warrants issued in the Private Placement.

30.    As of the Petition Date, the Company owes an aggregate of $631,578.06 to the Investors pursuant to the Bridge Notes.

*Unsecured Notes Payable*

31.     As of the Petition Date, the Company owes an aggregate of $3,847,367.71 of unsecured notes payable and applicable interest to certain of the Company's officers, former officers, former board members, or entities controlled by each, with annual interest rates ranging from 12% to 18%.

32.     As of the Petition Date, the aggregate amount owed to all of the Debtors' prepetition secured and unsecured debtholders is approximately $36.3 million.

## II.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

33.     The Company has had ongoing financial difficulties for years, incurring negative cash flows from operating activities and net losses. The Company has been unable to pay commissioned sales brokers, lenders, mandatory debt repayments, or its key suppliers. The Company has attempted to raise additional capital by issuing debt or equity securities and increasing the sales of the Company's services and products. However, the Company has been unable to raise sufficient additional capital or increase revenues rapidly enough to achieve operating profits.

34.     In the spring of 2017, the Company attempted to raise $17 million in additional capital. However, despite the Company's efforts, which included an extensive roadshow, the Company failed to raise the additional capital.

35.     In July of 2017, the Company lost approximately 50% of its members when the State of Louisiana discontinued the Company's services. Despite the significant loss in revenue, the Company failed to significantly reduce its overall cash spending in response.

36.     In September 2017, the Company sought to renegotiate its supplier agreement with BioTelemetry. At that time, the Company owed BioTelemetry approximately $4 million.

On September 25, 2017, the Company entered into the New Telcare Agreements. The New Telcare Agreements allowed BioTelemetry to invoice customers directly and have access to Company bank accounts. In addition, BioTelemetry increased the cost of glucometers and testing strips in an attempt to recoup uncollected receivables. However, BioTelemetry encountered difficulty in invoicing customers resulting in uninvoiced customers for several weeks. As a result, the Company re-established its invoicing process, and the delay resulted in uneven (and unknown) cash receipts.

37.    Despite the Company's inability to pay BioTelemetry or sales brokers, the Company maintained its cash spending at unsustainable levels. The Company continued to be optimistic regarding future increasing sales, and projections provided by management and consultants exceeded the Company's business conditions. Specifically, the prospect of business with the Cleveland Clinic Foundation d/b/a Cleveland Clinic, an Ohio nonprofit corporation ("**Cleveland Clinic**"), became a focal point of the Company's strategy to increase sales.

38.    On December 1, 2018, the Company received correspondence from Cleveland Clinic, a large medical complex, indicating that the Company's diabetic monitoring services may fit into Cleveland Clinic's Medicare ACO (Accountable Care Organization). It was further indicated that entering into an agreement with Cleveland Clinic could add 14,000–15,000 new members, roughly tripling the size of the Company's business. The Cleveland Clinic business relationship was built on the personal relationship between Cleveland Clinic senior manager, Kevin Sears, and a former Company CEO and Founder, David Derrick. Purizer Corporation, a business controlled by Mr. Derrick, would earn commission on the Company's revenues from any Cleveland Clinic agreement.

39.     Based on cash projections prepared in November, and the potential increased business that would result from an agreement with Cleveland Clinic, several Investors, who were existing lenders of the Company, collaborated in an attempt to raise between $750,000 and $1.5 of Bridge Financing. The Investors ultimately raised $550,000. In conjunction with the Bridge Financing, I was appointed as the Company's Chairman and CEO effective December 11, 2017. I provided an additional $50,000, resulting in total Bridge Loans of $600,000. However, the Bridge Loans were inadequate in advancing the Company.

40.     The Cleveland Clinic had indicated an eagerness to move quickly as the Company's plan would provide significant savings to the Cleveland Clinic ACO. On December 22, 2017, the Company entered into a Services Agreement (the "**CC Agreement**") with Cleveland Clinic, pursuant to which the Company would provide monitoring services to Cleveland Clinic's expected beneficiary diabetic population within the Cleveland Clinic Medicare ACO. The initial term of the agreement was for three years and would automatically renew after the term for a successive twelve (12) month period from year to year unless sooner terminated by either party in accordance with the terms of the CC Agreement.

41.     As a result of communication issues between the parties, on March 20, 2018, the Company received a ninety (90) day written notice of termination of the Agreement from the Cleveland Clinic, effective June 14, 2018. In response, the Company sent Cleveland Clinic a demand letter requesting payment of $340,000 pursuant to the terms of the CC Agreement.

42.     On that same date, March 20, 2018, PFG sent the Company that certain Notice of Default notifying the Company of certain Events of Default under the Loan and Security Agreement and Modification. In April 2018, PFG began contacting the Company with concerns that certain of the Company's factors, including CBSG, were receiving daily cash draws while

PFG was receiving no payments of interest or principle under the Loan and Security Agreement. PFG exercised its rights under its Depository Account Control Agreement and notified the factors that it was shutting down their draws. In response, CBSG filed a lawsuit in Philadelphia seeking approximately $2 million against the Company and Jeffrey Peterson, the Company officer that had signed a guarantee for the CBSG factoring debt. PFG has joined in the litigation against CBSG. Additionally, in March 2018, EBF Partners, LLC, another factor, filed a lawsuit against the Company in New York seeking to recover approximately $135,000. The lawsuit was settled on April 20, 2018 for approximately $85,000.

43.    In light of the foregoing and the strong recommendation of PFG, the Company began discussions with BioTelemetry, the Company's largest unsecured creditor and key supplier, as the logical purchaser of the Company. BioTelemetry sent a letter of intent to purchase the Company as part of a chapter 11 case and section 363 sale under the Bankruptcy Code.

44.    The Company's Board of Directors met on June 13, 2018 and made the determination that it is in the best interests of the Company, its creditors, and other parties in interest to seek relief under chapter 11 of the Bankruptcy Code and seek to sell substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, and since then, the Debtors have duly made preparations for these Chapter 11 Cases.

45.    The Debtors will conduct a postpetition marketing and sale process pursuant to section 363 of the Bankruptcy Code. The Debtors intend to sell substantially all of their assets in these Chapter 11 Cases to the highest and best bidder. BioTelemetry has been identified as the leading candidate to be the stalking horse bidder in the sale process. The Company is unable to obtain additional secured or unsecured credit from sources other than PFG, but PFG has agreed

15

to allow the Debtors to use its cash collateral to fund the Chapter 11 Cases and the 363 sale. Given their lack of liquidity, the Debtors need to complete the 363 sale process as expeditiously as possible.

## III.    FIRST DAY PLEADINGS

46.    In furtherance of the objective of a value-maximizing sale of the Debtors' assets, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully requests that the Court consider entering the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

47.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

**A.**    *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")*

48.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their Chapter 11 Cases, two (2) in total, for procedural purposes only. Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, and orders, thereby saving

16

64377026.2

considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

      **B.**     ***Motion of Debtors for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs*** **(the "Schedules Extension Motion")**

49.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional nineteen (19) days, from the date such Schedules and Statements are otherwise required to be filed, for a total of thirty-three (33) days from the Petition Date.

50.     Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among the multiple tranches of creditors and other creditor constituencies. The Debtors are working expeditiously to prepare and file their Schedules and Statements, and I believe, considering the expedited sale procedures being sought, that Schedules and Statements will be filed as soon as possible. Notwithstanding, in an abundance of caution, it is in the best interests of the Debtors to respectfully request an extension of nineteen (19) days.

51.     In light of the amount of work entailed in completing the Schedules and Statements, the substantial burdens already imposed on management by the commencement of the Chapter 11 Cases, the limited number of employees available to collect the required information, the competing demands upon such employees, and the time and attention the Debtors must devote to the restructuring process, I believe that "cause" exists to extend the

deadline by an additional nineteen (19) days, through and including August 8, 2018. Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible.

C.     *Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices* (the "**Cash Management Motion**")

52.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing Cash Management System (defined below), including maintenance of the Debtor Bank Accounts (defined below) and existing checks and business forms, (ii) granting the Debtors a temporary suspension of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their Cash Management System or other actions described herein, (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices, and (iv) authorizing and directing all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

53.     In the ordinary course of their business, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer cash as needed to respond to the cash requirements of the Debtors.

54.     The Cash Management System is managed by the Debtors at their headquarters in Orem, Utah, where they oversee the administration of the various bank accounts to effectuate the

18

collection, disbursement, and movement of cash. Their oversight facilitates accurate cash forecasting and reporting and the monitoring of collection and disbursement of funds to and from the Debtors' Bank Accounts (as defined below).

55.    As of the Petition Date, the Debtors maintain a primary depository operating account, and two additional depository accounts (collectively, the "**Debtors' Bank Accounts**") in the United States. Specifically, the Debtors' Bank Accounts are located at Zions Bank in the United States (primary operating account and depository accounts). A schedule of the Debtors' Bank Accounts is annexed to the Cash Management Motion as Schedule 1. As reflected in Schedule 1, each of the Debtors' Bank Accounts is held in the name of the Debtors.

56.    The Debtors both receive and disburse funds. To the extent that funds are received, they are deposited into the operating account at Zions Bank. All operating disbursements are made from the Zions Bank operating account via check, wire, or ACH. To a minimal extent, funds are transferred between the Debtors' Bank Accounts through the use of online transfers. The Zions Bank operating account is covered by a Deposit Account Control Agreement with Partners for Growth IV as agent (the "**Zions Bank Account Control Agreement**").

57.    The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and its goal of maximizing value for the benefit of all parties in interest.  I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burden, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.

Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements, and the Debtors' Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

**D.**     ***Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Critical Vendors* (the "<u>Critical Vendors Motion</u>")**

58.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay the prepetition claims (the "**Critical Vendor Claims**") of certain third party outside sales brokers, a warehouseman, and critical software counterparties that are essential to maintaining the going concern value of the Debtors' business (the "**Critical Vendors**") in an amount not to exceed $100,000 on an interim basis and $150,000 on a final basis (with respect each of the interim and final periods, as applicable, the "**Critical Vendor Cap**").

59.     In the ordinary course of their businesses, the Debtors utilize certain third party outside sales brokers, warehouse certain inventory, and purchase essential services from certain software contract counterparties that are unaffiliated with the Debtors without which the Debtors could not operate. The Critical Vendors are essential to maintaining business continuity, delivering essential services to clients in a timely manner and, ultimately, maintaining customer satisfaction.

60.     Because the Debtors will benefit from avoiding the severe disruption to the Debtors' operations that would occur if the Debtors were to lose certain brokers and vendors, I believe that it is prudent for the Debtors, in their discretion, to pay selected Critical Vendors some or all of their prepetition claims.  Consistent with these needs, and to ensure that the Debtors' liquidity is preserved as they transition their business into chapter 11, the Debtors seek authority to implement procedures that will assist them in securing favorable terms and to deal with any vendors that may repudiate or otherwise refuse to honor existing obligations to the Debtors.

61.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. Toward that end, the Debtors have carefully estimated all potential vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that the ability to satisfy Critical Vendor Claims is absolutely necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtors.  To be clear, the Debtors are aware of the need to seek relief only for those vendors truly critical to the Debtors' ongoing operations.  Furthermore, the Debtors believe that a portion of the Critical Vendor Claims may be entitled to administrative priority under Bankruptcy Code section 503(b)(9), and that payment of those Critical Vendor Claims would merely expedite the treatment they are otherwise entitled to and abides by the priority scheme of the Bankruptcy Code.

62.     The Debtors have spent significant time reviewing and analyzing their books and records to identify truly critical suppliers of goods and services. The Debtors have carefully reviewed their suppliers to determine, among other things, (i) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (ii) the Debtors' ability to find alternative sources of supply and the potential

disruption or lost revenues while a new supplier was resourced, (iii) which suppliers would be prohibitively expensive to replace, (iv) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, and (v) the extent to which suppliers may have an administrative expense claim pursuant to Bankruptcy Code section 503(b)(9). After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.

63.     The Debtors began the process by identifying vendors and brokers that had received payment from the Debtors in fiscal year 2018. Of those parties, the Debtors identified a small percentage of the Debtors' total vendors that comprises the select group of Critical Vendors. The Debtors estimate that they will be required to pay approximately $100,000 of the Critical Vendor Claims during the interim period prior to a final hearing on this Motion.

64.     I believe that the Critical Vendors are so essential to the Debtors' business that the absence of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and client satisfaction. I believe that this irreparable harm to the Debtors and to the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the Critical Vendor Claims.

 **E.**  ***Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers*** **(the "<u>Employees and Wages Motion</u>")**

65.     Pursuant to the Employees and Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition claims and honor

obligations incurred or related to compensation obligations, withholding obligations, incentive programs, vacation policies, reimbursable expense obligations, employee benefits obligations, workers' compensation claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including administrative fee obligations) (collectively, the "**Employee Obligations**") and (ii) maintain, continue, and honor, in the ordinary course of business, incentive programs, vacation policies, postpetition reimbursable expense obligations, employee benefits plans, and workers' compensation claims (collectively, the "**Employee Plans and Programs**").

66.     As of the Petition Date, the Debtors currently employ approximately 12 full-time salaried and 12 hourly employees (the "**Employees**"), all of whom work at the Debtors' headquarters in Orem, Utah. I believe that the Employees are vital for the Debtors' business, and the loss of certain Employees could impede the Debtors' short-term objectives and seriously harm their ability to successfully implement their business strategy. Furthermore, replacing Employees during the Chapter 11 Cases will be difficult for the Debtors given the limited resources available to find and pursue replacement employees.

67.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations (as defined below), certain Employees may seek employment elsewhere, potentially with the Debtors' competitors. I believe that the loss of Employees at this juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the administration of the Chapter 11 Cases.

68.     In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. The Debtors pay Employees on a bi-weekly basis on every other Thursday. The Debtors' fixed salary Employees and their hourly Employees are paid two week in arrears. The last date that Employees were compensated prior to the Petition Date was July 5, 2018.

69.     As of the Petition Date, all Employees elected to have their payroll administered via direct deposit. The Debtors use Paychex, Inc. ("**Paychex**") to process their payroll and coordinate the payment of Withholding Obligations (as defined below). In connection with each payroll cycle, Paychex pulls cash out of the Debtors' operating bank account for both employee and employer tax obligations at the same time, concurrent with the draw for net paycheck obligations each pay period. The Debtors pay Paychex approximately $640 per month for their services, which include payroll processing, benefits administration, data processing services, and management of certain COBRA benefits (the "**Administrative Fee Obligations**").

70.     I believe that the ongoing services of Paychex are imperative to the smooth functioning of the Debtors' operations and payroll system. As of the Petition Date, no amounts were owed to Paychex in connection with its services.

71.     The Debtors' bi-weekly gross payroll on account of the Employees averages approximately $60,400. The next scheduled payroll date for Employees is July 19, 2018 and will include salaries and wages earned prepetition. I estimate that, as of the Petition Date, the Debtors owed approximately $24,200 on account of accrued and unpaid prepetition salaries and wages (the "**Employee Compensation Obligations**"). To the best of my understanding, none of the Employees are owed individually more than $12,850 in accrued and unpaid general prepetition wages or salaries.

72.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations and any unpaid Administrative Fee Obligations. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations and/or Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

73.     For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, certain pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein, including 401(k) contributions, legally-ordered deductions, and other miscellaneous deductions (collectively, the "**Deductions**"). The Debtors withhold approximately $1,700 per month on average from Employees' wages on account of Deductions, which the Debtors remit to the appropriate third-party recipients.

74.     In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). The Debtors withheld approximately

$39,516 in June, 2018 for Employee Withholding Taxes, and the Debtors' June, 2018 monthly payment for Employer Payroll Tax Obligations was approximately $16,811.

75.     Pursuant to the Employees and Wages Motion, the Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy Payroll Tax Obligations (collectively, the "**Withholding Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

76.     In the ordinary course of business, the Debtors have typically maintained a bonus program for their Employees. The Debtors maintain a performance-based bonus program for non-insider Employees (the "**Bonus Program**"). Bonuses earned under the Bonus Program (the "**Bonuses**") are paid quarterly. All bonuses due have been paid prior to the Petition Date.  The Debtors plan to re-asses their bonus program post petition.

77.     The Debtors offer their Employees paid time off ("**PTO**"). This program is typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization and/or sale process.

78.     Full time regular and part time regular employees accrue PTO on a monthly basis based on years of service. Accrual tiers range from 6.78 hours per month up to 12.30 hours per month. Accrual for PTO is continuous with no current maximum. Accrued and unused PTO is paid out to an Employee upon his or her departure from the company in good standing. I estimate that as of the Petition Date the value of accrued but unpaid PTO is $89,730.

79.     In the Employees and Wages Motion, the Debtors request that they be authorized, but not directed, to continue to honor their PTO policy, including during the administration of these Chapter 11 Cases, and any PTO that accrued prepetition.

80.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed certain of their Employees for all reasonable, ordinary, and necessary receipt-supported business expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**"). All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy. In all cases, reimbursement is contingent on the Debtors' receipt of expense reports, receipts, and business purpose explanations prior to determination that the charges are for legitimate, reimbursable business expenses.

81.     The Debtors processes expense and reimbursement claims on a rolling basis. It is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement. However, as of the Petition Date, I estimate that there were no amounts owed on account of prepetition Reimbursable Expense Obligations.

82.     Employees incurred Reimbursable Expense Obligations as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses. The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of these Chapter 11 Cases.

83.     In the ordinary course of business, the Debtors offer various benefit plans and policies for their Employees that can be divided into the following categories: (a) prescription

64377026.2

and medical benefits (the "**Medical Plan**"), dental care (the "**Dental Plan**"), and vision care (the "**Vision Plan**", and collectively, with the Medical Plan and the Dental Plan, the "**Health Plans**"); (b) group term life insurance and short-term disability insurance (collectively, the "**Income Protection Plans**") (collectively, with the Health Plans and the Income Protection Plans, the "**Employee Benefits Plans**"). In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans. All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "**Employee Benefits Obligations**."

84.    Employee contributions to the Health Plans have been and are collected through payroll deductions from participating Employees. I believe that it is necessary and appropriate to continue to honor their obligations to current and former Employees under the Health Plans. Accordingly, in the Employees and Wages Motion, the Debtors request authority, but not direction, to pay all prepetition amounts due under the Health Plans. The Debtors also request authority, but not direction, to continue to offer the Health Plans and honor their obligations thereunder in the ordinary course during the administration of these Chapter 11 Cases.

85.    The Debtors' medical plan (the "**Select Health Plan**") is administered by Select Health ("**Select**"). The Select Health Plan offers eligible Employees the ability to select a medical plan through Select for themselves and eligible dependents. The Debtors pay a portion of the premium cost under the Select Health Plan. Currently, 11 of the 24 Employees utilize the Select Health Plan, which has a monthly gross cost to the Debtors of approximately $9,300.00. As of the Petition Date, $10,269.00 was owed on account of the Medical Plan.

86.    The Debtors also offer their Employees the ability to choose a dental plan through EMIHealth (the "**Dental Plan**"). Currently, 13 of the 24 Employees utilize the Dental Plan. The

Debtors match a portion of the premium cost under the Dental Plan. The Dental Plan has a monthly gross cost to the Debtors of approximately $957.00.  As of the Petition Date, $1,271.00 was owed on account of the Dental Plan.

87.    The Debtors offers a Vision Plan administered by Humana Insurance Co. (the "**Vision Plan**"). Currently, 14 of the Debtors' 24 Employees utilize the Vision Plan. The Debtors match a portion of the premium cost under the Vision Plan. The Vision Plan has a monthly gross cost to the Debtors of approximately $185.00.  As of the Petition Date, $232.47 was owed on account of the Vision Plan.

88.    The Debtors offer certain Income Protection Plans including group term life insurance (the "**Life Insurance**"), which the Debtors fully subsidize. All of the Debtors' Employees have Life Insurance. Life Insurance gross costs the Debtors approximately $930 per month. The Debtors estimate that as of the Petition Date, $942.85 was owed on account of the Life Insurance.

89.    The Debtors maintain an insurance policy that covers workers' compensation claims ("**Workers' Compensation Insurance**"). The Debtors estimate that as of the Petition Date, no amounts were owed on account of Worker's Compensation Insurance.

90.    The Debtors' ability to successfully operate is contingent on a reliable and loyal Workforce. As stated above, competition for qualified employees is intense in the Debtors' industry. Thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Plans and Programs in the ordinary course of business throughout these Chapter 11 Cases. I believe that a failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or, in the case of Contract Workers, the decision to not complete work for the Debtors or accept future hiring

proposals. I believe that the loss of even a few key personnel would immediately and irreparably

harm the Debtors' ability to maintain operations to the detriment of all interested parties.

**F.** ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and (VI) Granting Related Relief* (the "<u>Cash Collateral and DIP Motion</u>")**

91.     Pursuant to the Cash Collateral and DIP Motion, the Debtors request, among other

things the following relief:

     a.     *DIP Facility:* authorization for the Debtors to obtain priming senior secured post-petition financing on a superpriority basis pursuant to the terms and conditions of the Pre-Petition Loan Agreement (as defined below) and the Pre-Petition Loan Documents (as defined below), with the exceptions set forth on <u>Appendix A</u> attached to the Interim Order (the "**DIP Loan Agreement**"; together with the agreements, documents, instruments and certificates executed by the Debtors or otherwise delivered in connection therewith, the "**DIP Loan Documents**"), by and among the Debtors and Partners For Growth IV, LP, a Delaware limited partnership ("**PFG**" or the "**DIP Lender**"), providing for, *inter alia*, a superpriority, new money, term loan credit facility providing for the borrowing of loans in accordance with the Approved Budget (as defined below) in an aggregate principal amount not to exceed $800,000 (the "**DIP Facility**")

     b.     *DIP Loan Documents*: authorization for the Debtors to execute and deliver the DIP Loan Agreement and the other DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

     c.     *DIP Liens and Claims*: authorization to grant the DIP Lender an allowed superpriority administrative expense claim against the Debtors' estates;

     d.     *Cash Collateral*: authorization to use cash collateral within the meaning of Bankruptcy Code section 363(a) and authorization to use the proceeds of the DIP Loan;

     e.     *Adequate Protection*: approval of the Adequate Protection (as defined below) to the DIP Lender;

      f.     *Automatic Stay Modification*: approval of the proposed modification of the automatic stay pursuant to Bankruptcy Code section 362; and

      g.     *Interim and Final Hearings*: the scheduling of interim and final hearings, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, for consideration of this Motion and the Final DIP Order.

92.     I believe that the Debtors' obtaining credit on an interim basis pursuant to the DIP Facility as provided for herein is necessary to avoid immediate and irreparable harm to the Debtors, their estates, creditors, and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees and otherwise to finance their operations through the chapter 11 process requires the availability of working capital from the DIP Facility. Without the ability to use Cash Collateral and access the Interim Financing (as defined below) and the DIP Facility, I believe that the Debtors, their estates and creditors would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital or financing to operate its business or maintain its properties in the ordinary course of business without the DIP Facility.

93.     Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than provided for in the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain sufficient credit (i) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) secured solely by a junior lien on property of the

Debtors and their estates that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the DIP Lender (1) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

94.    I believe that the Debtors have exercised their sound business judgment by entering into the DIP Facility. The terms and conditions set forth the DIP Loan Documents are fair and reasonable. The DIP Facility will allow the Debtors to access up to $800,000. Further, the DIP Facility benefits the Debtors by allowing the use of Cash Collateral, thereby reducing the amount which must be borrowed.

95.    While the Debtors are not required to seek credit from every source, the Debtors and their professionals nevertheless undertook a process to evaluate other potential sources of postpetition financing, finding none obtainable on better terms.

96.    The terms and conditions of the DIP Loan Documents were negotiated by the parties in good faith and at arm's length. The Debtors will require a significant postpetition financing to support operations and restructuring. Only the DIP Lender was able to provide a facility which was adequate, reasonable, and fair under the circumstances. Therefore, I believe the Court should find that the DIP Lender is a "good faith" lender.

97.    The Debtors have determined, in their sound business judgment, based upon their own analysis and the recommendations of their professionals, that the DIP Loan Documents provide the best opportunity for postpetition financing on the most favorable terms available. It is necessary to preserve the administrative of the Chapter 11 Cases, and therefore, will benefit all creditors. The DIP Facility allows the Debtors to continue operations and maintain the value of

the estates for an anticipated sale of all or substantially all of their assets under Bankruptcy Code section 363.

> **G.** ***Motion of Debtors for Entry of (I) An Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Stalking Horse and Bid Protections, (C) Approving the Form and Manner of Notice Thereof, (D) Scheduling an Auction and Sale Hearing, (E) Approving Procedures for the Assumption and Assignment of Contracts, and (F) Granting Related Relief; and (II) An Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Successful Bidder, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief*** (the "<u>**Sale and Bid Procedures Motion**</u>")

98.     The Debtors intend to sell substantially all of their assets in the Chapter 11 Cases, and Partners for Growth IV, L.P. (the "**DIP Lender**") has, subject to certain conditions, agreed to provide financing and to allow its cash collateral to be used to fund the Chapter 11 Cases and the 363 sale. Most notably, the Debtors are required to use the proceeds from the sale to first pay the DIP Lender all amounts due and owing under the postpetition DIP Facility, and secondly then to satisfy any outstanding obligations under the DIP Lender's prepetition debt with the Debtors. Given their lack of liquidity, the Debtors needs to complete the 363 sale process as expeditiously as possible.

99.     As part of the proposed sale process, the Debtors, through their financial advisor and their professionals, will engage in a comprehensive marketing effort for the Debtors' assets, contacting both financial and strategic investors regarding a potential sale process, including all parties contacted prior to the commencement of the cases. There will be no conditions on potentially interested parties regarding bid levels, structure, financing, or management in connection with the solicitation of indications of interest. All interested parties will be given an opportunity to execute a confidentiality agreement and be given access to the data room maintained by counsel to the Debtors. Those parties that execute a confidentially agreement will

be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

100.     I believe a prompt sale of the Assets represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases. Moreover, it is critical for the Debtors to execute on a sale transaction as expeditiously as possible, as the Debtors are utilizing the DIP Lender's cash collateral and additional financing in order to conduct this sale process. Therefore, time is of the essence.

101.     Pursuant to the Sale and Bid Procedures Motion, the Debtors request that the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this motion on shortened notice. These dates are subject to change in the event that the Bankruptcy Court does not enter an order at that hearing:

(i)     **Contract Cure Objection Deadline**: Objections to the potential assumption and assignment of any Contract will be filed and served no later than **August 15, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "**Cure or Assignment Objection**").

(ii)     **Bid Deadline**: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, if one has been accepted by the Debtors as contemplated by the Bidding Procedures Order, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) must be received by no later than **August 17, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

(iii)     **Auction**: The Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **August 21, 2018** at 10:00 a.m. (prevailing Eastern Time), or such other location as identified by the Debtors after notice to all Qualified Bidders.

(iv)     **Sale Objection Deadline**: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on **August 15, 2018**.

(v)     **Sale Hearing**: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **August 22, 2018**.

102.    I believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing the bankruptcy estates. The proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following the Petition Date to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. I believe that the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

103.    Moreover, I have determined that the bid submitted by the Stalking Horse Bidder (the "**Stalking Horse Bid**") was the highest and best bid. The bid submitted by the Stalking Horse Bidder provides that the Company will continue to operate as a going concern. As part of its bid, the Stalking Horse Bidder negotiated for the timeline requested herein. The Debtors believe that an expedited sale process will minimize any further deterioration of the Assets and is in the best interests of all stakeholders. Thus, the Debtors have determined that pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## IV.    CONCLUSION

104.    The Debtors' goal in these Chapter 11 Cases is the maximization of estate value through a marketing and sales process. In the near term, however, the Debtors' immediate objective is to maintain its business during the early stages of these Chapter 11 Cases with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court

grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of substantially all of the Debtors' assets will be substantially enhanced.

105.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of July, 2018.

**ActiveCare, Inc.**

Debtors and Debtors in Possession

*/s/ Mark Rosenblum*
_____

Mark Rosenblum
Chief Executive Officer and Chairman
