## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ACTIVECARE, INC., *et al.*,[1]<br><br>         Debtors. | Chapter 11<br><br>Case No. 18-_____ (___)<br><br>(Joint Administration Pending) |

### MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SETTING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

ActiveCare, Inc. ("**ActiveCare**") and 4G Biometrics, LLC ("**4G Biometrics**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), hereby move (the "**Motion**"), pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 4001, and 9014 of Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"); and Rules 2002-1, 4001-1, 4001-2, and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for entry of an order, substantially in the form of Exhibit A attached hereto (the "**Interim Order**"), (i) authorizing the Debtors to obtain secured postpetition financing; (ii) authorizing the use of Cash Collateral (as defined below); (iii) granting adequate protection; (iv) modifying the automatic stay; (v) setting a final hearing; and (vi) granting related relief. In support of the Motion, the Debtors rely upon the *Declaration of Mark Rosenblum, Chairman and Chief Executive Officer of Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, filed with the Court concurrently herewith (the "**First Day**

---

[1]  Pursuant to 11 U.S.C. § 342(c)(1), the Debtors in these cases, along with the last four digits of each Debtor's federal tax-identification number, are: ActiveCare, Inc. (8125); and 4G Biometrics, LLC (5678).  The location of the Debtors' corporate headquarters and their address for notice purposes is 1365 West Business Park Drive, Suite 100, Orem, UT 84058.

Declaration"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors respectfully request entry of the Interim Order, which among other things, provides for the following relief:

a.      *DIP Facility*: authorization for the Debtors to obtain priming senior secured post-petition financing on a superpriority basis pursuant to the terms and conditions of the Pre-Petition Loan Agreement (as defined below) and the Pre-Petition Loan Documents (as defined below), with the exceptions set forth on Appendix A attached to the Interim Order (the "**DIP Loan Agreement**"; together with the agreements, documents, instruments and certificates executed by the Debtors or otherwise delivered in connection therewith, the "**DIP Loan Documents**"), by and among the Debtors and Partners For Growth IV, LP, a Delaware limited partnership ("**PFG**" or the "**DIP Lender**"), providing for, *inter alia*, a superpriority, new money, term loan credit facility providing for the borrowing of loans in accordance with the Approved Budget (as defined below) in an aggregate principal amount not to exceed $800,000 (the "**DIP Facility**")

b.      *DIP Loan Documents*: authorization for the Debtors to execute and deliver the DIP Loan Agreement and the other DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

c.      *DIP Liens and Claims*: authorization to grant the DIP Lender an allowed superpriority administrative expense claim against the Debtors' estates;

d.      *Cash Collateral*: authorization to use cash collateral within the meaning of Bankruptcy Code section 363(a) and authorization to use the proceeds of the DIP Loan;

e.      *Adequate Protection*: approval of the Adequate Protection (as defined below) to the DIP Lender;

f.      *Automatic Stay Modification*: approval of the proposed modification of the automatic stay pursuant to Bankruptcy Code section 362; and

g.     *Interim and Final Hearings*: the scheduling of interim and final hearings, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, for consideration of this Motion and the Final DIP Order.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Under Local Rule 9013-1(f), the Debtors consent to entry of a final order under Article III of the United States Constitution. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 6004-1.

## BACKGROUND

**A.     General Background**

4.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

5.     Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to manage and operate their business as debtors

3

in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

**B.     Prepetition Secured Indebtedness[2]**

6.     On February 19, 2016, ActiveCare, Inc. ("**ActiveCare**") entered into a loan and security agreement (as amended or modified from time to time, the "**Loan and Security Agreement**") with Partners for Growth IV, L.P. (the "**Pre-Petition Lender**") and issued certain notes payable in connection therewith. Pursuant to the Loan and Security Agreement, the Pre-Petition Lender made available credit to ActiveCare in the maximum aggregate principal amount of $4,500,000. These obligations are secured by a first priority security interest in all of the Debtors' assets.

7.     After defaulting under the Loan and Security Agreement, ActiveCare entered into multiple forbearance agreements with the Pre-Petition Lender, pursuant to which the Pre-Petition Lender agreed to forbear from exercising remedies under the Loan and Security Agreement due to ActiveCare's defaults until a date specified in the applicable forbearance agreement (collectively, the "**Forbearance Agreements**").

8.     On March 31, 2017, PFG and ActiveCare entered into Modification No. 1 to the Loan Agreement and Security Agreement (the "**Modification 1**"), pursuant to which the Pre-Petition Lender agreed to lend ActiveCare up to an additional $300,000 (the "**Additional Loan**"). On March 20, 2017, the Pre-Petition Lender loaned ActiveCare $300,000, representing the maximum amount of the Additional Loan. The Additional Loan (i) bears interest at the rate of 12.25% per annum; (ii) became due May 31, 2017; (iii) required payment of a $3,000 modification fee; and (iv) required payment of a monthly fee of up to $50,000 for each month the

---

[2]  The terms contained within this Motion are qualified in their entirety by the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

Additional Loan remains outstanding. The Additional Loan is secured by all of the Debtors' assets.

9.      Since April 2018, ActiveCare and the Pre-Petition Lender have entered into additional modification agreements to the Loan and Security Agreement, whereby the Pre-Petition Lender agreed to provide an additional advance of loans to ActiveCare. On April 11, 2018, the Pre-Petition Lender and ActiveCare entered into that certain Modification No. 2 to Loan and Security Agreement ("**Modification No. 2**"). Subsequent to Modification No. 2, the Pre-Petition Lender made protective advances to ActiveCare in the aggregate principal amount of $998,000 so that ActiveCare could continue its operations. On June 6, 2018, the Pre-Petition Lender and ActiveCare entered into that certain Modification No. 3 to Loan and Security Agreement ("**Modification No. 3**"). On June 19, 2018, the Pre-Petition Lender and ActiveCare entered into that certain Modification No. 4 to Loan and Security Agreement ("**Modification No. 4**"). The Loan and Security Agreement, Modification 1, Modification 2, Modification 3, and Modification 4 are hereinafter collectively referred to as the "**Pre-Petition Loan Agreement**").

10.      On July 2, 2018, 4G Biometrics, LLC ("**4G Biometrics**") executed a Joinder to Loan and Security Agreement, joining 4G Biometrics as a co-Borrower under the Pre-Petition Loan Agreement (the "**Joinder**"). The Pre-Petition Loan Agreement, and the other agreements, documents, instruments, and certificates executed by the Debtors or otherwise delivered in connection with the Pre-Petition Loan Agreement are hereinafter collectively referred to as the "**Pre-Petition Loan Documents**".

11.      Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Lender agreed to provide the Debtors with revolving loans and term loans in an aggregate principal amount of up to $4,500,000.  As of the Petition Date, the outstanding principal amount owed by the Debtors

5

with respect to the revolving loans, term loans and other protective advances made under the Pre-Petition Loan Agreement was not less than $4,863,976.15 (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Pre-Petition Loan Documents, including, without limitation, accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of the Debtors' obligations pursuant to the Pre-Petition Loan Documents, the "**Pre-Petition Obligations**").

12.     To secure the Pre-Petition Obligations, the Debtors granted to the Pre-Petition Lender security interests in and liens on (collectively, the "**Pre-Petition Liens**"), substantially all assets and properties of the Debtors, as more specifically set forth in the Pre-Petition Loan Agreement, including, without limitation, all Accounts,[3] all Inventory, all Equipment, all Collateral Accounts, including Deposit Accounts (including all of the Debtors' cash, the "**Cash Collateral**"), all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights, and interests in any of the above, and all guaranties and security for the any of the above, and all substitutions and replacements for, additions, accession, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of any of and all of the above; and all Debtors' books relating to any of the above (collectively, and as defined as "Collateral" in the Pre-Petition Loan Agreement, the "**Pre-Petition Collateral**").

---

[3] Capitalized terms not otherwise defined in this sub-paragraph shall the meanings ascribed to them in the Pre-Petition Loan Documents.

64287557.5

13.     The Pre-Petition Lender filed: (a) UCC-1 Financing Statements regarding the Pre-Petition Collateral against the Debtors in the applicable state and/or county filing offices; and (b) notices of security interest regarding the Pre-Petition Collateral consisting of intellectual property in the applicable filing offices.

14.     The Debtors represent that all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original Pre-Petition Collateral or proceeds of other Pre-Petition Collateral, constitute the Pre-Petition Collateral of the Pre-Petition Lender.

15.     The Debtors are in default of their debts and obligations under the Pre-Petition Loan Documents.

C.     **The Debtors' Need for Postpetition Financing and the Use of Cash Collateral**

16.     The Debtors' obtaining credit on an interim basis pursuant to the DIP Facility as provided for herein is necessary to avoid immediate and irreparable harm to the Debtors, their estates, creditors, and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees and otherwise to finance their operations through the chapter 11 process requires the availability of working capital from the DIP Facility.  Without the ability to use Cash Collateral and access the Interim Financing (as defined below) and the DIP Facility, the Debtors, their estates and creditors would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital or financing to operate its business or maintain its properties in the ordinary course of business without the DIP Facility.

17.     Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than provided for in the DIP Facility.  The Debtors have been unable to

64287557.5

obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain sufficient credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DIP Lender (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

## SUMMARY TERMS OF THE DIP FACILITY[4]

18.     The following is a concise summary of the material terms of the proposed DIP Loan Documents:

| Provision | Description |
|---|---|
| **Borrowers** | ActiveCare, Inc. and 4G Biometrics, LLC |
| **Lender** | Partners for Growth IV, L.P. |
| **Entities with Interests in Cash Collateral** | The DIP Lender and Pre-Petition Lender |
| **Purpose for Use of Cash Collateral**  Interim Order ¶¶ G(v), 4, and 14 | As a condition to entering into the DIP Loan Agreement, the extension of credit under the DIP Facility and the authorization to use the proceeds of the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with an |

---

[4]  The following summary is included for convenience only and is qualified in its entirety by reference to the DIP Documents, which shall control in the event of any inconsistency. Capitalized terms used in this summary, unless otherwise defined, have the meaning used in the DIP Documents.

64287557.5

Approved Budget, solely for (a) working capital and other general corporate purposes of the Debtors, (b) payment of the costs of administration of this Case, including, without limitation, the costs, fees, and expenses incurred (i) in connection with the DIP Facility, and (ii) by the Pre-Petition Lender in connection with these Chapter 11 Cases, in each case, to the extent such costs, fees, and expenses are reimbursable pursuant to the terms of the Pre-Petition Loan Documents, as applicable, and (c) subject to paragraph 43, repayment of the Post-Petition cash collections in accordance with the DIP Loan Documents reducing the Post-Petition Obligations due to the DIP Lender.

Unless otherwise agreed to by the DIP Lender, the Debtors shall use the proceeds of the DIP Facility solely for operating working capital purposes and chapter 11 administrative costs in the amounts and otherwise in accordance with and for the purposes provided for in the Approved Budget.

The proceeds of the DIP Facility will be used only for the following purposes, in each case in accordance with and subject to an Approved Budget and except as otherwise agreed by the DIP Lender: (i) working capital and other general corporate purposes of the Debtors, (ii) payment of the costs of administration of these Chapter 11 Cases, including, without limitation, the costs, fees, and expenses incurred (a) in connection with the DIP Facility, and (b) by the Pre-Petition Lender in connection with these Chapter 11 Cases, in each case, to the extent such costs, fees, and expenses are reimbursable pursuant to the terms of the Pre-Petition Loan Documents, and (iii) subject to paragraph 43, repayment of the Post-Petition cash collections in accordance with the DIP Loan Documents reducing the Post-Petition Obligations due to the DIP Lender.

Without in any way limiting the foregoing, no DIP Collateral, proceeds of the DIP Loans, any portion of the Carve-Out, or any other amounts may be used directly or indirectly, without the prior written consent of the DIP Lender, by the Debtors, the Committee, if any, any other committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or Successor Cases, or any other person or entity (or to pay any professional fees, disbursements, costs, or expenses incurred in connection therewith): (i) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim (except to the extent expressly set forth herein), the Adequate Protection Liens or the Pre-Petition Lender Superpriority Claims, or the Pre-Petition Liens; (ii) to investigate (including by way of

9

| | |
|---|---|
| | examinations or discovery proceedings), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any of the DIP Lender, the Pre-Petition Lender, or any of their controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing (collectively, the "**Released Parties**"), with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (a) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (b) any so-called "lender liability" claims and causes of action, (c) any action with respect to the validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Pre-Petition Lender Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Pre-Petition Loan Documents or the Pre-Petition Obligations, (d) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Pre-Petition Obligations, (e) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to either (1) the DIP Lender hereunder or under any of the DIP Loan Documents, or (2) the Pre-Petition Lender under any of the Pre-Petition Loan Documents (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Lender's or the Pre-Petition Lender's assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents, Pre-Petition Loan Documents, and the Interim and/or Final Orders), or (f) objecting to, contesting, or interfering with, in any way, the DIP Lender's and the Pre-Petition Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Loan Agreement) has occurred; provided, however, that no more than $25,000 in the aggregate of the DIP Collateral, the Carve-Out and proceeds from the borrowings under the DIP Facility may be used by any Committee to investigate claims against the DIP Lender and/or liens granted to the Pre-Petition Lender under the Pre-Petition Loan Documents. |
| **DIP Lender Collateral** | To secure the Pre-Petition Obligations, the Debtors granted to the Pre-Petition Lender security interests in and liens on (collectively, the "**Pre-Petition Liens**"), substantially all assets and properties of |

| | |
|---|---|
| Interim Order ¶¶ E(v) and 9 | the Debtors, as more specifically set forth in the Pre-Petition Loan Agreement, including, without limitation, all Accounts,[5] all Inventory, all Equipment, all Collateral Accounts, including Deposit Accounts (including all of the Debtors' cash, the "**Cash Collateral**"), all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights, and interests in any of the above, and all guaranties and security for the any of the above, and all substitutions and replacements for, additions, accession, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of any of and all of the above; and all Debtors' books relating to any of the above (collectively, and as defined as "Collateral" in the Pre-Petition Loan Agreement, the "**Pre-Petition Collateral**").<br><br>To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as set forth more fully in the DIP Loan Documents, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, priming, first-priority security interests in and liens (collectively, the "**Priming DIP Liens**") on all assets or property of the Debtors, subject to the Carve-Out and Permitted Prior Liens, in each case, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation: all Pre-Petition Collateral; all Accounts; all Inventory; all Equipment; all Collateral Accounts, including Deposit Accounts; all General Intangibles (including without limitation all Receivables and Intellectual Property); all Investment Property; all Other Property; any and all claims and/or causes of action existing under the Bankruptcy Code, including, but not limited to, subject to entry of a Final Order, claims and/or causes of action existing under Sections 542, 544, 547, 548, 549, and/or 550 of the Bankruptcy Code (collectively the "**Avoidance Actions**"); all equity interests in another Person owned by Debtors; and any and all claims, rights, and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds  (including, but not limited to, proceeds of |

---

[5]  Capitalized terms not otherwise defined in this sub-paragraph shall the meanings ascribed to them in the Pre-Petition Loan Documents.

64287557.5

proceeds, claims against third parties, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the aforementioned collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) of, any and all of the above, all Debtors' books relating to any of the above, and any and all products and proceeds of the foregoing in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, and other documents; upon entry of a Final Order providing for such relief, the Debtors' rights under Section 506(c) of the Bankruptcy Code; and to the extent not covered by the foregoing, all other assets or property of the Debtors (subject to any exclusions contained in the DIP Loan Agreement), whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to such Debtors from time to time with respect to any of the foregoing (all of which being hereinafter collectively referred to as the "**DIP Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.  The Pre-Petition Liens shall continue, shall (to the extent that any of the Pre-Petition Obligations are refinanced) inure to the benefit of the DIP Lender, shall secure the DIP Obligations, and shall be included in the definition of "DIP Liens."  Notwithstanding anything contained herein to the contrary, upon entry of a Final Order providing for such relief, any provision of any lease or other license, contract, or other agreement that requires (x) the consent or approval of one or more landlords or other parties or (y) the payment of any fees or obligations to any governmental entity, in order for Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest or other license, contract, or other agreement, or the proceeds thereof, or other post-petition collateral related thereto, will be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest or other license, contract, or other agreement, or the proceeds of any assignment and/or sale thereof by Debtors, in favor of the DIP Lender or the Pre-Petition Lender in accordance with the terms of the DIP Loan Documents or this Interim Order.  Upon entry of the Final Order, all landlord agreements or bailee waivers to which any of the Pre-Petition Lender is a party shall be deemed amended to include the DIP Lender as a beneficiary thereunder, and such

| | |
|---|---|
| | agreements shall thereafter be additionally enforceable by the DIP Lender against, and binding upon, each landlord or bailee party thereto in accordance with, and subject to, its respective terms and conditions until the DIP Obligations have been paid in full in cash and the DIP Loan Agreement shall have been terminated. |
| **DIP Loan**<br><br>Interim Order ¶¶ Preface(i) and G(i). | The DIP Facility, as further described in the DIP Loan Documents, consists of a superpriority, new money, term loan credit facility providing for the borrowing of loans in accordance with the Approved Budget in an aggregate principal amount not to exceed $800,000, with an interim borrowing limit of $300,000. |
| **DIP Term**<br><br>Interim Order ¶ 32<br><br>Appendix A to Interim Order | On the Termination Date (as defined in the DIP Loan Agreement), all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility and the Debtors authorization for the use of Cash Collateral will terminate.<br><br>Maturity Date of September 15, 2018 |
| **DIP Budget**<br><br>Interim Order ¶ 23 | (a)      The Debtors have prepared and delivered an initial 13-week budget to the DIP Lender (the "**Initial Approved Budget**"), which reflects the Debtors' anticipated cumulative cash receipts, expenditures, and net cash flow on a weekly basis and all necessary and required cumulative expenses that the Debtors, in consultation with any financial advisors engaged by the DIP Lender, expect to incur during each week of the Initial Approved Budget.  The Debtors' actual aggregate disbursements shall not exceed the aggregate amount of disbursements in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for the applicable period by more than the Permitted Variance (as defined below), and (ii) actual aggregate cash receipts (excluding proceeds of the DIP Facility that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for such period by more than the Permitted Variance; provided, however, that a Default or Event of Default (each as defined in the DIP Loan Agreement) shall not be deemed to occur on account of the failure to meet one of such aggregate cash receipts covenants if the Debtors receive sufficient additional receipts within three (3) business days after the applicable date of determination that, when added to the receipts as of the applicable date of determination, would enable the Debtors to satisfy such covenant.<br><br>(b)      "**Permitted Variance**" will mean (i) any favorable variance, (ii) an unfavorable variance of no more than 5.00% with respect to |

| | |
|---|---|
| | each week after the Closing Date and on a rolling three-week basis with respect to each subsequent week (each such period, a "**Testing Period**").  The Permitted Variance with respect to each Testing Period shall be determined and reported to the DIP Lender not later than the Tuesday immediately following each such Testing Period. Subject to paragraph 23(a) above, variances, if any, from the Initial Approved Budget or any subsequently Approved Budget, and any proposed changes to the Initial Approved Budget or any Approved Budget, shall be subject to the approval of the DIP Lender.<br><br>The Initial Approved Budget shall be modified or supplemented from time to time consistent with the provisions of paragraph 19 hereof (i.e., a revised 13-week cash flow forecast that must be approved by the DIP Lender), in each case without further notice, motion or application to, order of, or hearing before, this Court.  For all purposes hereunder, (i) the Initial Approved Budget shall constitute an "Approved Budget," and (ii) any Approved Budget shall replace any prior Approved Budgets (including the Initial Approved Budget) for all Testing Periods ending after the approval of such Approved Budget. |
| **Interest Rate**<br><br>Appendix A to Interim Order | The DIP Term Loans hall bear interest at a per annum rate equal to **12.75%** fixed.<br><br>Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. The interest rate applicable to the Obligations shall change on each date there is a change in the Prime Rate.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law. |
| **Adequate Protection**<br><br>Interim Order ¶¶ H and 17 | The Pre-Petition Lender is entitled to receive adequate protection to the extent of any Diminution in Value of its interests in the Pre-Petition Collateral.  Pursuant to Sections 361, 363, and 507(b) of the Bankruptcy Code and subject to the terms of this Interim Order, as adequate protection, the Pre-Petition Lender will receive the adequate protection liens and claims, and the professional and other expense reimbursements, as more fully set forth in paragraph 17 herein.<br><br>(a)    Pre-Petition Lender's Adequate Protection Liens and Claims. Pursuant to Sections 361, 363(e), 364(d), and 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender, the Debtors hereby grant to the Pre-Petition Lender, the following: |

|  | (i)      continuing, valid, binding, enforceable, and perfected post-petition "replacement" liens on the Pre-Petition Collateral to the extent of any post-petition Diminution in Value of the Pre-Petition Lender's interest in the DIP Collateral (the "**Adequate Protection Liens**"), which liens will be junior to the DIP Liens, the Permitted Prior Liens, the Pre-Petition Liens, and the Carve-Out; |
|  | (ii)      an allowed superpriority administrative expense claim in these Chapter 11 Cases to the extent of any post-petition Diminution in Value of the Pre-Petition Lender's interest in the Pre-Petition Collateral (the "**Pre-Petition Lender Superpriority Claims**"), which claims will be junior only to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out and, with respect to the DIP Collateral, any validly perfected secured claim, and be payable from and have recourse to all assets and property of the Debtors. |
|  | (b)      <u>Adequate Protection Payments</u>.  As further adequate protection for the Pre-Petition Lender, the Debtors are authorized to provide adequate protection in the form of current interest payments and, any and all reasonable and documented (in summary form) out-of-pocket fees, costs, and expenses of the Pre-Petition Lender (including all reasonable fees, costs, disbursements, and expenses of its outside counsel), subject to the Approved Budget.  Subject to the Carve-Out and paragraphs 35(b) and 43, the payments set forth in this paragraph are not and shall not be subject to any offset, defense, claim, counterclaim, diminution, or recovery, of any type, kind or nature whatsoever. |
|  | (c)      <u>Access to Books and Records</u>.   As further adequate protection for the Pre-Petition Lender, the Debtors shall provide the Pre-Petition Lender with access to the Debtors' books and records and such financial reports as are provided to the DIP Lender. |
| **DIP Lien Priority**<br><br>Interim Order ¶ 10 | (a) The DIP Lender, and for the purpose of securing the DIP Obligations, shall have the following DIP Liens:<br>  i.     Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable, automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected, and unavoidable security interest or lien as of the Petition Date, subject only to the Carve-Out;<br>  ii.    Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, automatically and fully perfected junior liens on and security interests in all DIP Collateral, wherever located, subject only to |

<table>
<tr><td></td><td>Permitted Prior Liens, the Pre-Petition Liens and the Carve-Out;<br><br>iii. Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral securing the Pre-Petition Obligations, subject only to Permitted Prior Liens.<br><br>(b) Except as expressly set forth herein, absent further order of the Court, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in this Case, and shall be valid and enforceable against any trustee appointed in these Chapter 11 Cases, upon the conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, and/or upon the dismissal of these Chapter 11 Cases or any Successor Cases, subject only to the Carve-Out. The DIP Liens shall not be subject to (i) Sections 510, 549, or 550 of the Bankruptcy Code, or (ii) upon entry of a Final Order providing for such relief, Sections 506(c) or 551 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.</td></tr>
<tr><td>**Termination Event**<br><br>Interim Order ¶ 15</td><td>The occurrence of any of the following events (the "**Termination Events**") shall constitute an Event of Default under the DIP Loan Agreement and a termination event under this Interim Order:<br><br>(a) for a period in excess of three (3) calendar days, reversal, vacatur, or stay of the effectiveness of this Interim Order or the Final Order (the "**Orders**") without the express prior written consent of the DIP Lender;<br><br>(b) without the written consent of the DIP Lender, (i) dismissal of these Chapter 11 Cases or conversion of these Chapter 11 Cases to a chapter 7 case, or appointment of a chapter 11 trustee or examiner or other responsible officer with enlarged powers relating to the operation of the business of the Debtors in these Chapter 11 Cases, which dismissal, conversion, or appointment shall not have been reversed, stayed, or vacated within three (3) calendar days, (ii) termination of the exclusive period for the Debtors to file a plan of reorganization in these Chapter 11 Cases or the filing of a plan of reorganization in these Chapter 11 Cases, or (iii) the Debtors shall seek or request the entry of any order to effect any of the events described in subclause (i) of this clause (b);</td></tr>
</table>

16

(c)     the occurrence of any Event of Default (as defined in the DIP Loan Agreement), or the occurrence of any Default following the passage of any applicable notice or cure period set forth in the DIP Loan Agreement regardless of any acts or omissions of the DIP Lender that would otherwise have resulted in such Default not becoming an Event of Default by virtue of such passage of any applicable notice or cure period;

(d)     the entry by this Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that materially adversely affects the Debtors' property, without the written consent of the DIP Lender;

(e)     three (3) business days after written notice to the Debtors of the failure by the Debtors to deliver to the DIP Lender any of the documents or other information required to be delivered pursuant to the Orders when due (during which time the Debtors may cure) or any such documents or other information shall contain a misrepresentation of a material fact when made;

(f)     except as set forth herein, three (3) business days after the failure by the Debtors to observe or perform any of the material terms or provisions contained in the Orders;

(g)     the entry of an order of this Court granting any lien on or security interest in any of the DIP Collateral that is *pari passu* with or senior to the DIP Liens held by the DIP Lender on or as security interests in the DIP Collateral, the Adequate Protection Liens, the Pre-Petition Lender Superpriority Claims or the Pre-Petition Liens, or the Debtors shall seek or request the entry of any such order;

(h)     the Debtors' creating or permitting to exist any other superpriority claim that is *pari passu* with or senior to the claims of the DIP Lender, the Adequate Protection Liens, the Pre-Petition Lender Superpriority Claims or the Pre-Petition Liens, except for the Carve-Out;

(i)     the Debtors filing a pleading, or in any way support another party's pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in the Orders without the prior written consent of the DIP Lender;

(j)     the entry of an order of this Court amending, supplementing, or otherwise altering any of the terms and conditions

set forth in the Orders without the prior written consent of the DIP Lender;

(k)    the Debtors use the DIP Facility for any item other than those set forth in the Approved Budget or the Carve-Out, except as agreed in writing in advance by the DIP Lender;

(l)    the Debtors (or any party with the support of the Debtors) shall file a plan of reorganization in these Chapter 11 Cases if the filing of such plan is made without the prior written consent of the DIP Lender;

(m)    any uninsured judgments are entered with respect to any post-petition liabilities against the Debtors or any of their properties in a combined aggregate amount in excess of $50,000 unless stayed, vacated, or satisfied for a period of twenty (20) calendar days after entry thereof;

(n)    the failure of the Debtors to meet any of the following milestones, unless extended or waived by the DIP Lender:

(i)    to obtain entry of the Interim Order in form and substance satisfactory to the DIP Lender in its sole discretion on or before the second (2nd) day after the Petition Date;

(ii)    to obtain entry of the Final Order in form and substance satisfactory to the DIP Lender in its sole discretion on or before on or before the thirty-fifth (35th) day after the Petition Date;

(iii)    to file a motion with the Court seeking approval of the Sale Order on or before the seventh (7th) day after the Petition Date;

(iv)    to obtain the scheduling of the date for the hearing on the Bid Procedures Order on or before the twenty first (21st) day after the Petition Date;

(v)    to obtain entry of an order by the Court approving bidding procedures for the sale of substantially all of the Debtors' assets (the "**Bidding Procedures Order**") in form and substance satisfactory to the DIP Lender on or before the twenty third (23rd) day after the Petition Date;

18

(vi) to conduct an auction for the sale of substantially all of the Debtors' assets pursuant to the Bidding Procedures Order on or before the third day before the Sale Hearing (as defined below);

(vii) to hold a sale hearing ("**Sale Hearing**") for the approval of the sale of substantially all of the Debtors' assets pursuant to the Bidding Procedures Order on or before the fortieth (40th) day after the Petition Date; and

(viii) to obtain entry of an order by the Court approving the sale of substantially all of the Debtors' assets ("**Sale Order**") on or before the forty-fifth (45th) day after the Petition Date;

(o) the Debtors seek to sell any of their assets outside the ordinary course of business, unless (i) the proceeds of such sale are used to indefeasibly pay the DIP Obligations in full in cash, and to the extent there are remaining proceeds thereafter, are used to indefeasibly pay the Pre-Petition Obligations at closing, and (ii) such sale is pursuant to bidding procedures and a sale motion approved by the DIP Lender;

(p) the Debtors filing of a plan of re-organization in these Chapter 11 Cases that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Lender;

(q) the Debtors (or any party with the support of the Debtors) shall challenge the validity or enforceability of any of the DIP Loan Documents or the Pre-Petition Loan Documents; and (r) the Debtors shall make any a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness, trade payables, or other pre-petition claims against the Debtors, unless expressly provided in the Orders or consented to by the DIP Lender.

| | |
|---|---|
| **Carve-Out**<br><br>Interim Order ¶ 41 | For the purposes of this Interim Order, the "**Carve-Out**" shall mean (a) the payment of allowed professional fees and disbursements incurred by bankruptcy counsel, retained pursuant to Sections 327 or 1103(a)(i) of the Bankruptcy Code, subject to the amounts set forth in the Approved Budget: (i) prior to the earlier of (1) the date on which the DIP Lender provides written notice (the "**Carve-Out Trigger Notice**") to Debtors that either an Event of Default has occurred or the DIP Loan Agreement is terminated or (2) the |

Termination Date; and (ii) in an amount not to exceed $25,000 on account of such professional fees and disbursements incurred by Debtors following the Carve-Out Trigger Notice (provided nothing herein shall be construed to (i) provide for double payment of any fees or disbursements; (ii) alter the procedures for the approval of professional compensation as set forth under the Bankruptcy Code and the rules of the Bankruptcy Court; (iii) alter the ability of any party to object to such fees and disbursements or (iv) extend the super-priority status of the Carve-Out to any portion unused by bankruptcy counsel); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court.   For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all liens securing the DIP Obligations, the Pre-Petition Obligations, the Adequate Protection Liens and all claims and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, or the Pre-Petition Obligations granted herein to the Pre-Petition Lender or the DIP Lender. The DIP Lender's Priming DIP Lien and Superpriority DIP Claim shall attach to any unused portion of the Carve-Out.

Subject to paragraph 43 herein, notwithstanding anything to the contrary herein, neither the Carve-Out nor any other DIP Collateral may be used for the payment of any fees or disbursements incurred in connection with: (a) attempting to modify or otherwise alter any of the terms and conditions set forth in this Interim Order, without the prior written consent of the DIP Lender; (b) asserting, alleging, bringing, or supporting any claim or cause of action, or the initiation or prosecution of any claim or action against the Pre-Petition Lender or the DIP Lender, including any causes of action under chapter 5 of the Bankruptcy Code or state law of any type or nature whatsoever, against any of the Pre-Petition Lender or the DIP Lender, including, without limitation, challenging the amount, extent, priority, validity, perfection, or enforcement of the Pre-Petition Obligations, the DIP Obligations, or any of the Pre-Petition Lender's or the DIP Lender's security interests and liens or to recover any funds previously paid to the Pre-Petition Lender or the DIP Lender; or (c) bringing or asserting any claims or causes of actions against the Pre-Petition Lender or the DIP Lender under the Pre-Petition Loan Documents or the DIP Facility (as the case may be), or their respective advisors or agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien, security, or interest of Pre-Petition Lender under the Pre-Petition Loan Documents in the Pre-Petition Collateral or of the DIP Lender under this Interim Order in the DIP Collateral.

64287557.5

| | |
|---|---|
| **Conditions to Borrowing** | Certain customary conditions precedent to the extensions of credit, including, among other things: (i) commencement of the Chapter 11 Cases; (ii) entry of the Interim Order; (iii) execution of the DIP Documents; (iv) compliance with the budget; and (v) payment of certain fees. |
| **Waiver/Modification of the Automatic Stay**<br><br>Interim Order ¶ 24 | The automatic stay imposed by Section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the Superpriority DIP Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the Adequate Protection Liens and the Pre-Petition Lender Superpriority Claims set forth in paragraph 14 hereof, and to take all appropriate action to ensure that the Adequate Protection Liens granted hereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations to the Pre-Petition Lender and the DIP Lender as contemplated under this Interim Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the DIP Lender and the Pre-Petition Lender to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents or the Pre-Petition Loan Documents and take any or all actions provided therein; (f) the Debtors to execute any amendments to the DIP Loan Documents agreed to in writing with the DIP Lender; and (g) the implementation of the terms of this Interim Order. |
| **Stipulations of the Debtors**<br><br>Interim Order ¶ E | The Interim Order contains certain stipulations by the Debtors regarding prepetition indebtedness. |
| **Challenge Period**<br><br>Interim Order ¶ 43 | The Committee (if any) and any other parties in interest (other than the Debtors) are permitted to undertake a Challenge (as defined below). Any party (other than the Debtors, which have waived any Challenge rights), including the Committee (if any), shall have a maximum of sixty (60) calendar days after the appointment of the Committee, if any, but in no event later than the earlier to occur of (x) seventy-five (75) calendar days from entry of the Interim Order and (y) the hearing approving the sale of substantially all of the Debtors' assets (the "**Ch. 11 Challenge Period**") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, and challenge (each, a "**Challenge**") the findings, the Debtors' stipulations, or any other |

stipulations contained in this Interim Order or any Final Order, including, without limitation, any challenge to the validity, priority, or enforceability of the Pre-Petition Liens, or to assert any claim or cause of action against the Pre-Petition Lender arising under or in connection with the Pre-Petition Loan Documents or the Pre-Petition Obligations, as the case may be, whether in the nature of a setoff, counterclaim, or defense of Pre-Petition Obligations or otherwise.  If these Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code prior to the latest date by which the Ch. 11 Challenge Period would end pursuant to the immediately preceding sentence, then any chapter 7 trustee appointed in such converted Cases shall have a maximum of sixty (60) calendar days (the "**Ch. 7 Challenge Period**" and, together with the Ch. 11 Challenge Period, the "**Challenge Period**") after the date that these Chapter 11 Cases are converted to bring any such Challenge.  The Challenge Period may only be extended: (a) with the prior written consent of the DIP Lender, as memorialized in an order of this Court, or (b) pursuant to an order of this Court upon a showing of good cause for such extension.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Challenge Period, upon the expiration of such applicable Challenge Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements, and stipulations contained in this Interim Order and any Final Order shall be irrevocably and forever binding on the Debtors, the Committee (if any), and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or this Court; (iii) the Pre-Petition Obligations shall be deemed to be finally allowed and the Pre-Petition Liens shall be deemed to constitute valid, binding, and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived, and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Pre-Petition Obligations.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Final Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.  Nothing in this Interim Order vests or confers on any person, including, without limitation, the Committee or any other statutory committee that may be appointed in these

22

| | |
|---|---|
| | Chapter 11 Cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates. |
| **506(c) Waiver**<br><br>Interim Order ¶ 45 | Upon entry of a Final Order providing for such relief, except for the Carve-Out, no costs or expenses of administration that have been or may be incurred in these Chapter 11 Cases at any time shall be charged against the DIP Lender or the Pre-Petition Lender or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order) or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |
| **Milestones**<br><br>DIP Credit Agreement § 4.2(o) | The failure of the Debtors to meet any of the following milestones constitute a Termination Event, unless extended or waived by the DIP Lender:<br><br>i.  to obtain entry of the Interim Order in form and substance satisfactory to the DIP Lender in its sole discretion on or before the second (2nd) day after the Petition Date;<br><br>ii. to obtain entry of the Final Order in form and substance satisfactory to the DIP Lender in its sole discretion on or before on or before the thirty-fifth (35th) day after the Petition Date;<br><br>iii. to file a motion with the Court seeking approval of the Sale Order on or before the seventh (7th) day after the Petition Date;<br><br>iv. to obtain the scheduling of the date for the hearing on the Bid Procedures Order on or before the twenty first (21st) day after the Petition Date;<br><br>v.  to obtain entry of an order by the Court approving bidding procedures for the sale of substantially all of the Debtors' assets (the "**Bidding Procedures Order**") in form and substance satisfactory to the DIP Lender on or before the twenty third (23rd) day after the Petition Date;<br><br>vi. to conduct an auction for the sale of substantially all of the Debtors' assets pursuant to the Bidding Procedures Order on or before the third day before the Sale Hearing (as defined below);<br><br>vii. to hold a sale hearing ("**Sale Hearing**") for the approval of |

|  | the sale of substantially all of the Debtors' assets pursuant to the Bidding Procedures Order on or before the fortieth (40th) day after the Petition Date; and |
|  | viii.    to obtain entry of an order by the Court approving the sale of substantially all of the Debtors' assets ("**Sale Order**") on or before the forty-fifth (45th) day after the Petition Date |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

19.    Local Rule 4001-2(a)(i) requires that financing motions must highlight the following provisions (the "**Highlighted Provisions**"), identify the location of any such provision in the proposed order, and justify such inclusion.

20.    <u>Cross-Collateralization.</u> Local Rule 4001-2(a)(i)(A) requires disclosure of provisions which grant cross-collateralization protection. There are no provisions which grant cross-collateralization protection (other than adequate protection and replacement liens).

21.    <u>Stipulation and Challenge Provisions.</u> Local Rule 4001-2(a)(i)(B) requires disclosure of provisions which bind the estate or parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order  and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters. Paragraphs E of the Interim order binds the estates and all parties in interest to the amount, validity, priority, perfection, and enforceability of the prepetition secured liens. However, as set forth in Paragraph 43 of the Interim Order, this is subject to a Challenge Period of 60 days from a Creditors' Committees' formation, if any, but in no event later than the earlier to occur of (x) 75 days after the entry of the Interim Order, or (y) the hearing to approve the sale of substantially all of the Debtors' assets. Therefore, all parties in interest will have a sufficient opportunity to investigate the prepetition secured liens.

64287557.5

22.    <u>506(c) Rights.</u> Local Rule 4001-2(a)(i)(C) requires disclosure of any provisions which seek to waive the estate's rights under Bankruptcy Code section 506(c). Paragraph 45 of the Interim Order provides that, upon entry of a Final Order providing for such relief, except for the Carve-Out, no costs or expenses of administration that have been or may be incurred in these Chapter 11 Cases at any time shall be charged against the DIP Lender or the Pre-Petition Lender or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order) or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

23.    <u>Liens on Avoidance Actions.</u> Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that grant prepetition secured creditors liens on avoidance actions pursuant to Bankruptcy Code sections 544, 545, 547, 548, and 549. Paragraph 9 of the Interim Order provides that, subject to entry of a Final Order, the DIP Lender will be granted a lien in, among other things the proceeds of any causes of action arising under Bankruptcy Code sections 542, 544, 547, 548, 549, and 550.

24.    <u>Use of Postpetition Loans to Pay Prepetition Debt.</u> Local Rule 4001-2(a)(i)(E) requires disclosure of provisions which use postpetition loans from a prepetition secured creditor to pay all or part of that secured creditor's prepetition debt. The Interim Order does not deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay all or part of that secured creditor's prepetition debt.

25.    <u>Carve-Out.</u> Local Rule 4001-2(a)(i)(F) requires disclosure of provisions which provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. Paragraph 41 of the Interim Order provides for a Carve-Out of certain fees and expenses, including the Debtors'

professionals and any professionals retained by any Creditors' Committee. The Interim Order does provide for disparate treatment of such professionals.

26. <u>Non-Consensual Priming Liens.</u> Local Rule 4001-2(a)(i)(G) requires disclosure of provisions which prime any secured lien without the consent of that lienor. The Interim Order does not provide for any non-consensual priming liens.

27. <u>Waiver of Bankruptcy Code section 552(b) "Equities of the Case".</u> Local Rule 4001-2(a)(i)(H) requires disclosure of provisions which affect the Court's power to consider the equities of the case under Bankruptcy Code section 552(b)(1). Paragraph 46 of the Interim Order provides that, upon entry of a Final Order providing for such relief, the Pre-Petition Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the Pre-Petition Lender with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral.

28. The provisions of the DIP Loan Documents are all justified under the circumstances of the Chapter 11 Cases because the DIP Lender would not agree to the DIP Facility and the use of cash collateral without the inclusion of such terms. As discussed *infra*, the funds provided by the DIP Facility are needed to allow the Debtors to operate and the DIP Facility presents the only available postpetition financing. The Debtors respectfully submit that the inclusion of the Highlighted Provisions are required and appropriate under the circumstances.

## BASIS FOR RELIEF

**A.     The Debtors Should be Authorized to Obtain Postpetition Financing**

29. The Debtors submit it is within their sound and prudent business judgment to obtain this postpetition financing. Bankruptcy Code section 364 permits debtors to obtain secured or superpriority postpetition financing when unsecured credit is not available. 11 U.S.C. § 364(c). Bankruptcy Courts, after notice and a hearing, may also authorize postpetition credit

26

secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d).

30.     With regarding to obtaining postpetition financing, debtors who utilize their sound business judgment are permitted considerable deference, so long as the postpetition financing does not conflict with the policies underlying the Bankruptcy Code. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivable facility because they "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). *See also Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."). Further, "courts will almost always defer to the business judgment of a debtor in the selection of a lender." *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).

31.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other grounds* 607 F.3d 957 (3d Cir. 2010). *See also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (noting that courts generally will not second-guess a debtor in

possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."). This inquiry involves the consideration of whether the terms are fair when considering the terms in light of the relevant circumstances of the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). Courts may also look to noneconomic benefits of postpetition financing. *See, e.g.*, *In re Ion Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) ("Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.").

32.     Debtors are not obligated and have "no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Say. Bank*

*FSB v. Sky Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989). *See also In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); *Ames*, 115 B.R. at 37-39; *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981); *In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st 1980); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

33.     Here, the Debtors have exercised their sound business judgment by entering into the DIP Facility. The terms and conditions set forth the DIP Loan Documents are fair and reasonable. The DIP Facility will allow the Debtors to access up to $800,000. Further, the DIP Facility benefits the Debtors by allowing the use of Cash Collateral, thereby reducing the amount which must be borrowed.

34.     While the Debtors are not required to seek credit from every source, the Debtors and their professionals nevertheless undertook a process to evaluate other potential sources of postpetition financing, finding none obtainable on better terms.

35.     The terms and conditions of the DIP Loan Documents were negotiated by the parties in good faith and at arm's length. The Debtors will require a significant postpetition financing to support operations and restructuring. Only the DIP Lender was able to provide a facility which was adequate, reasonable, and fair under the circumstances. Therefore, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Bankruptcy Code section 364(e).

36.     The Debtors have determined, in their sound business judgment, based upon their own analysis and the recommendations of their professionals, that the DIP Loan Documents provide the best opportunity for postpetition financing on the most favorable terms available. It is necessary to preserve the administrative of the Chapter 11 Cases, and therefore, will benefit all

creditors. The DIP Facility allows the Debtors to continue operations and maintain the value of the estates for an anticipated sale of all or substantially all of their assets under Bankruptcy Code section 363.

## B.    The Debtors' Use of Cash Collateral Should be Approved

37.    Bankruptcy Code section 363(c)(2) does not allow a debtor to use a secured creditor's cash collateral without consent or court approval. Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

38.    The Debtors request authority to use Cash Collateral on the terms set forth in the proposed Interim Order. At this time, the DIP Lender has consented to the use of Cash Collateral, thus meeting the requirements of Bankruptcy Code section 362(c)(2). Therefore, all entities with any interest in the Cash Collateral have consented.

## C.    The Interest of the DIP Lender are Adequately Protected

39.    Debtors may only obtain postpetition financing "secured by a senior or equal lien on property of the estate that is subject to a lien only if" adequate protection is provided to parties whose liens are primed. 11 U.SC. § 364(d)(1)(B). Bankruptcy Code section 361 delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. Adequate protection is determined on a case-by-case basis and may take various forms. *See, e.g.*, *In re Continental Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993); *MBank Dallas., N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of this requirement is to protect a secured creditor from diminution in the value of its interest in the

30

particular collateral during the period of use. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.").

40.    The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 is limited to use-based decline in value).

41.    Here, the Adequate Protection offered to the DIP Lender is fair and reasonable. The adequate protection proposed in the Interim Order is consistent with customary protections, including Adequate Protection Payments, replacement liens, and superpriority claims. The adequate protection properly protects the DIP Lender from any diminution in value of its interests in the use of the cash collateral during the pendency of the Chapter 11 Cases. These provisions were negotiated in good faith and at arm's-length with the DIP Lender. Without these protections, the Debtors would not be able to secure the DIP Facility.

**D.    Modification of the Automatic Stay is Warranted**

42.    The relief requested by this Motion contemplates a modification of the automatic stay. 11 U.S.C. § 362. The automatic stay should be modified on a limited basis to permit the DIP Lender to exercise, upon the occurrence and during the continuation of an Event of Default, and to take other remedies relating to the Collateral without further order or application to the Court. The DIP Lender is required to provide five (5) business days written notice on the Notice Parties prior to any enforcement right or remedy under the DIP Loan.

43.     This type of modification of the automatic stay is ordinary and standard feature of postpetition debtor in possession financing facilities, and, in the Debtors' business judgment, reasonable and fair under the current circumstances.

**E.      Interim Approval and Scheduling of a Final Hearing**

44.     Interim relief may be granted on a motion to obtain financing and use cash collateral pursuant to Bankruptcy Code sections 363(c) or 364 where relief "is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

45.     The Debtors will face immediate and irreparable harm without the entry of the Interim Order. Therefore, the Debtors respectfully request that the Court schedule a final hearing, no sooner than 14 days after the date of this Motion and no later than 25 days after the Petition Date, to consider entry of the Final DIP Order.

## CONSENT TO JURISDICTION

46.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

47.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Lender; (c) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; (d) the Internal Revenue Service; (e) the Taxing Authorities; (f) the United States Attorney for the District of Delaware; (g) the Attorney General for the state of Delaware; (h) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (i) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

64287557.5

48.     In addition, Interim Order will be served on the Notice Parties no later than one (1) business day after its entry by this Court. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required. A copy of the Motion also is available on the Court's website: www.deb.uscourts.gov.

## NO PRIOR REQUEST

49.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[The remainder of this page intentionally left blank]*

64287557.5

**WHEREFORE**, the Debtors respectfully request that this Court enter the Interim Order, the form of which is attached as Exhibit A hereto; and grant such other and further relief as is just and proper.

Dated:  July 15, 2018                                    Respectfully submitted,
            Wilmington, Delaware

                                                            **POLSINELLI PC**

                                                            _/s/ Christopher A. Ward_
                                                            Christopher A. Ward (Del. Bar No. 3877)
                                                            Justin K. Edelson (Del. Bar No. 5002)
                                                            222 Delaware Avenue, Suite 1101
                                                            Wilmington, Delaware 19801
                                                            Telephone: (302) 252-0920
                                                            Facsimile: (302) 252-0921
                                                            cward@polsinelli.com
                                                            jedelson@polsinelli.com

                                                            _Proposed Counsel to the Debtors and_
                                                            _Debtors in Possession_