IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ACTIVECARE, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-11659 (LSS)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 39 & 119** |

## DECLARATION OF MARK ROSENBLUM
## IN SUPPORT OF SALE

Pursuant to 28 U.S.C. § 1764, Mark Rosenblum, declares as follows under the penalty of perjury:

1. I serve as the Chairman of the Board of Directors ("**Chairman**") and Chief Executive Officer ("**CEO**") of ActiveCare, Inc., a Delaware corporation, along with its wholly-owned subsidiary 4G Biometrics, LLC, a Texas limited liability company (collectively, the "**Debtors**" or the "**Company**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2. I submit this declaration (this "**Declaration**") in support of the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances, and other interests (the "**Sale**").

3. On July 15, 2018 (the "**Petition Date**"), the Debtors each filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code.

4. On July 18, 2018, the Debtors filed the revised *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are ActiveCare, Inc. (8125) and 4G Biometrics, LLC (5678). The Debtors' mailing address is 1365 West Business Park Drive, Suite 100, Orem, Utah 84058.

65297631.2

*the Debtors' Assets, (B) Approving the Stalking Horse Bid Protections, (C) Approving the Form and Manner of Notice Thereof, (D) Scheduling an Auction and Sale Hearing, (E) Approving Procedures for the Assumption and Assignment of Contracts, and (F) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Successful Bidder, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "**Sale and Bid Procedures Motion**") [Docket No. 39].[2]

5. On August 17, 2018, the Court entered the *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Approving the Stalking Horse Bid Protections, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling an Auction and a Sale Hearing, (V) Approving Procedures for the Assumption and Assignment of Contracts, and (VI) Granted Related Relief* (the "**Bid Procedures Order**") [Docket No. 119].

6. Pursuant to the Bid Procedures Order, Telcare LLC served as the stalking horse purchaser ("**Telcare**" or the "**Stalking Horse Bidder**") pursuant to an Asset Purchase Agreement (the "**Stalking Horse Agreement**"). Pursuant to the Stalking Horse Agreement and the Bid Procedures Order, the Stalking Horse Bidder was entitled to:

   (a) a break-up fee (the "**Break-Up Fee**") in the amount equal to 3.0% of the total cash purchase price (totaling $112,500);

   (b) reimbursement of the Stalking Horse Bidder's reasonable and actual fees and expenses incurred as the Stalking Horse Bidder up to $170,000 (the "**Expense Reimbursement**"); and

---

[2] All capitalized terms herein undefined shall have the meaning ascribed to them in the Sale and Bid Procedures Motion.

(c)　　initial overbid protection in the amount of $100,000 (the "**Initial Overbid**" and, together with the Break-Up Fee and Expense Reimbursement, the "**Bid Protections**").

7.　　The Stalking Horse Agreement is for the purchase of substantially all of the Debtors' assets, however, certain assets of the Debtors will be left behind for the Debtors' estates such as valuable accounts receivable and various claims and causes of action, including preferences, fraudulent transfers, and D&O claims.

8.　　The Stalking Horse Agreement has a multi-faceted purchase price, which consists of (i) cash in the amount of $3,750,000, plus (ii) an amount equal to certain cure amounts up to a cure cap, plus (iii) a potential earn-out payment, plus (iv) forgiveness and cancellation of amounts payable under a promissory note, as well as various accounts payable owing to Telcare, plus (v) a transaction consideration product shipment amount, plus (vi) the assumption of various assumed liabilities.

9.　　The Bid Protections were heavily negotiated between the Debtors and Telcare and I believe that Telcare would not have entered into the Stalking Horse Agreement without the Bid Protections, including, but not limited to, the Break-up Fee, Expense Reimbursement, and Initial Overbid.

10.　　Furthermore, the Sale and Bid Procedures Motion sought to establish certain dates and milestones for the sale process. The Debtors, in consultation, and with the consent of, the DIP Lender agreed to modify the sales timeline as set forth below, which was the second consensual extension of the sales process since the Petition Date:

(a)　　***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract will be filed and served no later than **September 6, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "**Cure or Assignment Objection**").

(b)　　***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, if one has been accepted by the Debtors as

        contemplated by the Bidding Procedures Order, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) must be received by no later than **September 24, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

    (c)    *Auction*: The Auction was to be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **September 26, 2018** at 10:00 a.m. (prevailing Eastern Time), or such other location as identified by the Debtors after notice to all Qualified Bidders.

    (d)    *Sale Objection Deadline*: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on **September 18, 2018**.

    (e)    *Sale Hearing*: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **September 27, 2018**, subject to the Court's availability.

11.    Admittedly, there was no formal prepetition marketing process of the assets to be sold. However, since the Petition Date, the Debtors have retained Gavin/Solmonese, LLC ("**G/S**") as financial advisor and investment banker.

12.    Since their retention on August 1, 2018, G/S has worked diligently to (i) develop a list of prospective purchasers, (ii) prepare marketing and sale materials, including a teaser, (iii) contact and solicit interest from prospective purchasers, and (iv) assist and prepare due diligence materials and monitor an electronic data room.

13.    The efforts by G/S included outreach to approximately 1,165 potential bidders. Of these potential bidders, approximately 32 received additional information. Of those, 5 parties entered into NDAs and were granted access to the data room. G/S worked diligently with the Debtors and their advisors to garner as much interest in the sales process as possible during these Chapter 11 Cases. Despite these efforts, however, no qualified bids were submitted prior to the bid deadline of September 24, 2018. As a result, the Debtors cancelled the Auction.

14. As Chairman and CEO, I have been intimately involved in the bankruptcy preparation and sales process. I believe that the Stalking Horse Agreement reached with Telcare prior to the Petition Date is the highest and best, and likely only, option available to the Debtors in order to preserve the value of the Debtors' assets. It is also my understanding that the sale proceeds from the Telcare transaction are not enough to satisfy PFG in full, yet PFG still supports the sale to Telcare, or a higher and better bidder, as it sets a floor for other bidders and provides a minimum guaranteed recovery on their secured debt.

15. Additionally, I believe that there are a limited number of interested and potential purchasers for the Debtors' assets. As such, I do not believe there is any tangible benefit to an extended sale process, which differentiates these Chapter 11 Cases from other chapter 11 bankruptcy cases.

16. The Debtors need to be sold as quickly as possible in order to preserve their business as a going concern.

17. The Debtors' customers need and deserve certainty regarding the sale process. Certain of the Debtors' customers are very nervous regarding the bankruptcy process and have threatened to take their business to other providers. The Debtors and their customers need to complete the sale process as expeditiously as possible. The revised sale timeline provided for at least 7 full weeks of uninterrupted marketing by G/S, the Debtors, and the Committee and its advisors. It is my understanding that is customary in the restructuring industry for cases of this size.

18. I firmly believe that approval of the Sale will accomplish this goal of certainty for all parties in interest.

19. This is especially true given that it is my understanding that in addition to extending the DIP maturity date to September 30, 2018 and providing additional funding given this extension, the DIP Lender has agreed to increase the Committee's line item in the Budget to $100,000 through a $25,000 reduction in the DIP Lender's line item in the Budget. In addition, the DIP Lender has agreed to allow $100,000 of the funds to be received from the Colorado Choice settlement to be used to fund a combined liquidating plan and disclosure statement after the closing of the sale, which would provide for all remaining assets in the Debtors' estates, including all claims of causes of action, to be transferred to a liquidating trust for the benefit of creditors, as well as potentially significant accounts receivable. Therefore, the Debtors have provided for an appropriate closure of the Chapter 11 Cases. However, such funding for a combined liquidating plan and disclosure statement hearing is contingent on the DIP Lenders receiving the customary relief that a DIP Lender would receive in a case such as this.

20. In addition, based on my review of the alleged claims and causes of action that would be transferred to any liquidating trust, I believe that there is significant value to the preference claims, commercial tort claims, D&O claims, and any other claims that would be left to a liquidating trust.

21. I also believe that there is value to the accounts receivable that will remain after the closing of the sale, which will benefit the Debtors' estates as none of the factors of the Debtors have a valid perfected security interest in such accounts receivables.

22. I would also note that no insider of the Debtors is presently trying to acquire the assets, and to the best of my knowledge, the Stalking Horse Bidder is not a shareholder of the Debtors nor is it owned or run by any current or former officers or directors of the Debtors. The Debtors and Telcare only had a customer/vendor relationship that led to a large claim by Telcare

against the Debtors. The Debtors have negotiated for the Telcare claims to be forgiven as part of the sale. The Debtors also negotiated for up to $500,000 of product to be shipped to the Debtors pending approval of the sale. Without this product, the Debtors would not be able to operate. This is a significant concession by Telcare that has allowed these Chapter 11 Cases to proceed.

23. Therefore, all negotiations with Telcare were in good faith and at arm's length, and I know of no collusion with respect to the sale of the Debtors' assets.

24. Telcare also has no relationship to my knowledge with the former officers and directors, or their affiliates, of the Debtors.

25. In addition, all discussions with PFG were in good faith and at arm's length. Given the significant amounts due to PFG in its capacity as pre- and post-petition lender, I believe it is in the best interest of the Debtors' estates to pay the cash proceeds at closing of the sale immediately to PFG in order to partially satisfy its pre- and post-petition secured claims and reduce any additional interest payments that may be due to the DIP Lenders.

26. I have reviewed the most recent version of the Sale Order and I believe that it is in the Debtors' best interest and sound business judgment to proceed with Sale approval as quickly as possible.

27. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that the Sale be approved, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of September, 2018.

/s/ Mark Rosenblum
Mark Rosenblum
CEO and Chairman of the Debtors